Let's get started. Why you're not get started quite yet. The other side is not settled. Okay. They proceed.  I have to confess that I've spent a considerable amount of time during the pendency of this case and in preparing for today, trying to figure out what the outside edges are of the motor carrier exemption. And I still don't know. I don't know because it's the most inconsistently applied exemption that exists. Panels of this court have affirmed decisions that the same position in the same company, doing the same things, are both exempt and non-exempt. Panels of this court have also said it matters how frequently someone actually traveled in interstate commerce. It matters if there are records to substantiate that. And other panels have said it doesn't matter, as long as it could be reasonably called upon, in this case, to load materials destined for an interstate destination. At a very basic level, the application of the exemption to the workers in this case simply doesn't make sense. They're construction workers. They install screw piles on job sites. And at the end of the job or the end of the week, they occasionally load scrap or cutoff either onto trucks or into boxes that trucks ultimately pick up and take back to yards in either Colorado or Texas. And practically speaking, if the district judge is right in this case about the law, there's no limit to the exemption. It's not hyperbole. Every construction worker on every site in Texas, for example, where everyone drives an F-350 on a construction site, is exempt. In fact, I think if the district court's right, an employer could essentially buy this exemption by registering as a carrier, purchasing a big truck, an F-350 or bigger, and saying, during the course and scope of your work, we may call upon you from time to time to drive this truck in interstate commerce with materials destined for some interstate location. The problem is we submit that there are two separate standards under the Motor Carrier Act exemption, one for private carriers and one for common carriers. Those distinctions early on in the law and after the exemption was passed were observed rigorously. They still exist in the exemptions. The Department of Labor still enforces the exemption differently with respect to private carriers than it does with respect to common carriers. But recently, the distinction has become muddled, and courts apply the relaxed common carrier standard for private carriers. My understanding is there are documents in the record where your clients were required weekly, I think it was, to identify whether they were engaged, probably other things as well, engaged in these sorts of activities of loading and securing. Is that true? And what do those records show as to your clients? The records I think you're referring to are called employee work reports. It's something that the employer required. To show that each of your clients did this sort of work? They weren't just on the job site as construction workers, but they did actually physically do this on occasion? The records show that on occasion, my clients loaded materials onto trucks. So you're afraid of horribles about how bad this could be in creating a business as a trucker so you can exempt all your employees. It does seem to me that doesn't fit the facts of this case. The real issue is how frequently do they need to be that you're raising with us? And the inconsistent potentially fits circuit case law. This would be the only area, by the way, of the law that there's any inconsistency in our cases. But if they exist here, it seems to me that's where the question exists for us to resolve. Is there a frequency requirement? Right. And I think, Judge, that's one of the issues we raised in our post-trial motion. We asked the district court to make more specific findings about the frequency with which these folks loaded or didn't load. Because the records indicate, I think, being most generous, that they loaded once a week, kind of at the end of the week for a few hours. And keep in mind, my folks, most of them were welders. They were hired to weld. And so they spent maybe a few hours on a Friday at the end of the week putting. They were also construction team members and laborers. But they spent a few hours at the end of the week loading or at the end of a job that was a multi-week job loading. So I do think the frequency is a key issue. And this court, well, let me back up. Early ICC opinions in the Supreme Court, they exempted loaders who were full duty loaders. In the Levinson case, the loaders were solely responsible for loading. And those folks, they loaded materials at a freight terminal from a warehouse onto trucks all day, every day. This is not that case. In other cases, like I think Maya versus Noype, it mattered to the court how frequently someone was loading. It has to be substantial or solely. They can't just occasionally at the end of a week. In these cases you say are inconsistent, what's the best case for you and the worst case for you from our court? I have a ton. Well, the best case is probably some of the older Supreme Court cases. The Pyramid Motor case, the Wirtz versus CP Shoe case, Maya versus Noype, which is one of the ones I referenced earlier. A bad case would be Lucas versus Noype, which is same position, same employer, different result, also affirmed by this court. Or probably Songer, a bad case would be Songer versus Dillon Resources or Allen versus Coil Tubing. I will say, though, Judge Dennis's dissent in Allen versus Coil Tubing is pretty instructive on the history of the exemption. There's also, strangely, a Texas Court of Appeals case out of the Corpus Christi court where they applied this exemption to a similar fact pattern. I think, obviously, it's not binding, but I think the analysis is spot on. Mitchell versus CP Shoe is a case out of this court where this court has said for loaders to be exempt, they have to be doing that substantially. That has to be one of their substantial responsibilities. There's also some trial court cases, Hopkins versus Mass Climbers out of the Southern District. Yeah, I'm only talking about binding cases. Obviously, there's always cases. Well, not always, but often cases. But I'm looking at what's binding on us, which would be us and Supreme Court. I would say Mitchell versus CP Shoe, the Pyramid Motor case, and the Levinson case, where they really got into the weeds on these exemptions. And to put a finer point on this, those cases out of the late 40s were the last time the Supreme Court has ever addressed this exemption. It's been that long. Again, I know you've read the facts, but they are important in this case. It was a bench trial. Our folks were welders. They were construction team members. They were laborers. And they really didn't have any formal training on load securement. It was all on the job. They didn't know the Department of Transportation's cargo securement rules. They relied on the drivers, who were always ultimately responsible for the safe transportation of the load. The other issue, in addition to the frequency Judge Southwick mentioned, this court has said in, again, Amaya versus Noype, that an employer who wants to avail themselves of this exemption needs to tie each worker to the actual transportation of goods across state lines. At trial, I asked a corporate representative, when they load these trucks, do you know where they're going? Not exactly. They're going to one of our yards. OK, are there any records to substantiate that the materials that my clients loaded on these trucks actually traveled out of state? No, there weren't. Now, they were ultimately destined for one of two yards. One was in Colorado. One was in Texas. If you're working in Texas, which a large portion of these folks did, I think it's natural to assume that the truck leaving to take the scrap and the cutoff would probably travel to the Texas location. Well, you said that assumption. There's no evidence from the other side as to whether that's a decent assumption or whether it's sort of law of averages. If you do it often enough, some are going to go to Colorado. Some are going to go to the Texas side. I'm not talking about speculating. Is that in the evidence? Well, I mean, I point blank ask questions like that to the corporate representatives, and they said there's no evidence, that we cannot physically tie it. That's specific. What I'm talking about is the law of averages and some reasonable assumptions or reasonable findings from the evidence. Was there any evidence in the record that the trucks would go to one or the other at different times, no matter where they started? Not that I'm aware of, Judge. Again, though, as you know, this is an affirmative defense. It's not my burden to establish it at trial. No, I'm asking what's in the record, not what you had to prove. I'm not aware of any. The other error that we think the district court made, and there is some tension with some decisions from this court, is we think that for private carriers, not common carriers, but for private carriers, this exemption must be determined on a week-by-week basis. That's what the regulations say. 782.2b3, b4, and practically speaking, that's the way the Department of Labor approaches enforcing the exemption. And in this case, when the investigator investigated Alpine, because there was three separate investigations, he said, you're a private carrier, so if you can tie in certain work weeks some exempt loading duties to individual plaintiffs, they're exempt in those work weeks, but those work weeks only, because otherwise, they're laborers, they're welders, they work on construction sites doing construction-type work. And for whatever reason, the district court said, I don't have to do that. It's enough for me that they may be called upon in any given week to find that your folks are exempt. There's also a regulation, I think it's 782.2b4, that addresses this situation specifically. It says when workers who do a certain type of work are shifted from one job to another that may be exempt, they're exempt solely in those work weeks when they're doing that type of work. And this distinction between common carriers and private carriers, Judge, it makes a lot of sense, practically speaking. I'm a big fan of law making sense. I think we all are. Was the evidence here, though, that these plaintiffs did some loading work, all of them at least once a week? I wouldn't say at least once a week. I would say there's evidence that they all did loading work on individual job sites from time to time. Some of them said we did it weekly. Some of them said we did it monthly, because the job lasted a month, and it was at the end of the job or it was when we were not otherwise engaged doing welding or maybe waiting on the screw piles to arrive. But there's evidence, certainly, that they loaded. And I don't believe that there's evidence that every single plaintiff loaded every single week. But it does make a lot of sense to distinguish between private and common carriers. If you're a common carrier at a big freight terminal transporting goods or services across this country with inter- and intrastate routes, you're not going to tell your employees to load a truck differently than they would differently on one truck because it's going interstate than they would one truck that's going intrastate. It doesn't make sense. And practically speaking, the loader's not going to know. He's going to know that a truck shows up, and he's supposed to load product from the warehouse onto the truck. That's it. Private carriers are entirely different. They don't all run interstate routes. They're not obligated to take materials and transport them interstate. They know, and they have the capacity to know and to show, where their trucks are going and who loaded what. The other, I think, evidence I want to point out that supports our position that the carriers are treated differently is 29 CFR 782.2b3 talks about when loaders or other people are exempt. And there's a parenthetical in there that says, the main text of the regulation says, if you are actually, in fact, called upon. And then in parenthetical, it says, or in the case of a common carrier, could be called upon to load materials destined for an interstate route, then you're exempt. And the judge, though, in this case said, it doesn't matter. That distinction is immaterial. And we're just simply going to say that because your clients could be called upon in the course of their work to load materials on trucks that were bound for an interstate destination, they're exempt. And it should go without saying that what our folks did is a far cry from the loaders in the Pyramid case, the Levinson case, who were full duty, I think is the phrase the Supreme Court used, full duty loaders, who actually planned and built loads because they knew how to do it safely. These guys were doing something else most of the time. Unless there are any additional questions, I see my time is up. All right, counsel. Do you have time for rebuttal? Thank you. Thank you. May it please the court. My name is Levon Hovnatanian. And along with Steve Watkins, I represent the Appalooie, in this case, Alpine Site Services. This court has consistently declined to give a quantification of frequency on how often a loader or someone who's not a loader but still loads must load to come within the MCA exemption. We don't come up with a definite time. Is your friend on the other side correct that our cases, you probably wouldn't put it this way, are a mess? And that some come out saying exemption applies, and exemption doesn't apply in some other case? And it's sort of hard to figure out what's what? You've read more of these cases than I have. Be gentle, but what's your take on that? Your Honor, I'll be very gentle, and I respectfully do disagree with Mr. Hesse. There is no inconsistency in the court's case law. There is more than one standard under the MCA. And some of the court's cases apply one standard, and some apply the other, according to the facts of that case. Songer is the perfect example. In Songer, which is the first in the string, it came out in 1984, same year as Barefoot, but Barefoot was unpublished. And they concede, Barefoot and Songer are similar. Songer says the exemption applies even though, and that was a case about driving, not loading, even though some of the drivers don't drive any interstate routes. Now, one could look at that and say, well, how can that be right? Later in Songer, the court explains it, because the drivers, and this is a quote from the opinion, including the four plaintiffs who did not drive any interstate routes, could reasonably have been expected to drive in interstate commerce. That's why Songer is correct. That's why every case in its line is correct, because there's two standards. Some will apply one, some will apply the other. In this case, we exceeded both, because we didn't just show they could be called upon to load, or they were called upon to load. We showed they did load. And there's a chart in our brief, which sort of summarizes the evidence from the other side. And that chart shows a minimum of once a week. And that doesn't even count the testimony from Alpine's witnesses, who used adverbs like ordinary and routine, that this was something that these people did weekly. And that more than exceeds the standard. Of course, the rule of orderliness also applies here, and particularly to Songer, because Songer is the first case in the string. And that's the one they try to get out from under in their brief. The court could look at every opinion since Songer and decide those are all wrong. Those are all wrong. And under the rule of orderliness, it wouldn't matter. Songer controls unless the legislature changes the statute, which hasn't happened, the US Supreme Court says it's wrong, which hasn't happened, or this court goes en banc and changes the law, which hasn't happened since 1994, which we think gives the message the court's confident with Songer. That's what the law is. And there hasn't been anything inconsistent with that different, yes, inconsistent, no, since 1994. If you go all the way to 2018, in Amaya, the court says, consistent with regulatory guidance, this court never set a specific quantification of how frequently employees must engage in the sort of work that would qualify for the MCA exemption. Is this court held that a particular driver or loader was not engaged in that action enough and the exemption did not apply? Is there a case like that? There is a case, Your Honor. It's not from this court. There's actually several, and we don't quarrel with any of those cases because the frequency is less. The best case, in fact, the main one in their brief. Are there cases where frequency has been determinative? Correct. There has been. But their best case, according to their brief, is Hopkins, which came out of the Southern District of Texas in 2005. The court used the term few occasions. And he didn't mean few in a week or few in a month. He meant few in the whole record. And the court also said that particular employee exercised no discretion. And that's a quote from the opinion. Whereas in this case, we have people who are laborers, who are welders, who are operators, and even supervisors, who have been trained to load and do load literally on a weekly basis, some more. There's evidence in the record two times a week, three times a week, as needed, several times a month, ordinary duties, routine duties. We far exceed Hopkins and every other case that they cite in their brief on frequency. So we think in the Songer line of cases, this is literally the best one. Because it's not that they were called upon. They were. But they actually did load, all of them, with frequency. And in regard to frequency, referring to the two cases that Mr. Hesse discussed from 1947, there's Levinson and there's Ice Pass. And in both of those cases, the US Supreme Court said all we're looking for is a substantial part. The loader doesn't have to be a full time loader. It doesn't have to be somebody who doesn't do anything but load. Alpine doesn't even have anybody who would fit that description. Instead, it has to be someone who spends, in the words of the Supreme Court, a substantial part of time doing loading. And we think once a week more than qualifies for that. The court said either in whole or in substantial part in Ice Pass. It said any substantial part of the activities that come within those of a loader. The court even specified, the court shall not be concluded by the name which may have been given to his position. So there's no magic loader title. As in the record in this case, anyone can load and anyone did. The court even said in Ice Pass that the district court is not required to find that any specific part of his time in any given week must have been spent in these activities. There's similar language in Levinson, where the court says a full duty loader does not have to devote more than a substantial part of his time to loading. That's a quote from the case. And here we have substantial evidence, not just from Alpine but also from the claimants, that they did load and they did load regularly, which meets the standard that the courts have set for us. The next issue, your honors, is the records issue. This court has never said that in order to substantiate an MCA defense, an MCA exemption defense, there has to be records. Mere testimony is not enough. But the court has said that records aren't necessary. It did it in Cunningham in 2018. The defendant in that case was Circle 8 and the plaintiff was Cunningham. The court said the fact that Circle 8 has no records vis-a-vis Cunningham establishing compliance with the MCA is of no moment. That's a quote from the opinion. I can't say it better than this court did. You like that, huh? I did. Your honor, I'll repeat it if you'd like me to. The court said something similar in Alibos in 2016. It said, it is a pure jury question whether to believe the employees or the employer. Even though it could have decided in favor of native, the jury decided in favor of the drivers. And that was a case in which there were literally no records but one. And the court, in its opinion in 2016, said that one document, that one record, is useless. And the court took native to task for not having records, which Alpine certainly does. But the court still pointed out, look, it's a jury question. And this was a bench trial, so it's a judge question. Correct. Absolutely correct, your honor. And the standard of review, of course, requires great deference to the district court in a bench trial, particularly when the issue is one of credibility. For instance, how many times a week or a month or any particular period did these individuals load? Now on that particular issue, the parties appear to be consistent. There wasn't a whole lot of dispute between the claimants and Alpine at trial on how often the loading was accomplished. There is a very instructive case called Moore from the Western District in 2017 where the court summarizes Ice Pass and Levinson and says a loader is an employee whose duties include among other things the proper loading of his employer's motor vehicles. That's exactly what we have in this case, where we have supervisors and welders and laborers and operators who are participating in the loading and using their discretion. They were trained on the job, just as Mr. Hesse says, to load. But then there's abundant evidence in the record from both sides showing they used their independent judgment on how to do it. They used discretion. They collaborated with each other. They decided how to do it. Once they were trained, there was no more yard managers or project managers coming out and instructing them on how to do it. In fact, one of Alpine's managers testified, not only do I not do that, I don't want to do that. They know how to do it. They've been trained on it. I have other duties. They used their discretion to get it done. And of course, the record shows that since Mr. Goetjes' brush with death in the early 2000s, there's never been a problem with a load that Alpine has falling off, rushing through the cab, or hurting somebody. So apparently, they're trained correctly and trained well and used their discretion well to do the job correctly because of Alpine's safety record since then. So this system works. And it complies with the MCA. As far as interstate commerce goes, the record shows 10 different states where the screw piles are sent. And in that 10, I count Colorado and Texas. I don't count them because a load going from a site in Texas to a site in Texas is interstate commerce. It isn't. But those loads come back from the other eight states. The evidence in the record shows loads that go to other states at least partially come back to Texas or to Colorado because they are returning cutoff. And they are returning load test equipment and machinery that was used in the installation and excess cap plates. All those things return to Commerce City, Colorado, or Edna, Texas. So that brings the total to 10, 10 states where these loads are going and returning to. So we think this is a textbook MCA exemption case where because of Department of Labor audits three times, Alpine came up with a system that works and that documents everything that needs to be documented on the employee worksheets where the employee has to check one or more of 15 boxes, six of which relate to loading. No, they don't show which specific load went to which specific state, but they don't have to. The district court was correct. There's no law that would require Alpine to do that much. The MCA exemption doesn't require that much. It requires the interstate commerce. It requires loading with sufficient frequency. Those things exist in this record. The district court was correct to say so. All right, counsel. We ask this court to affirm. Mr. Hess, you remember I asked you whether or not the evidence in this case showed that all these workers loaded at least once a week. Right. So the lead plaintiff, Kelly, testified that he loaded at least once a week, right, at the trial? He did. Six other workers said they loaded at least once a week. Right. But you had some who said they didn't load at least once a week. Correct. They testified at the trial as well? Yes. All right. And that's in our brief. I think it's on, if you give me a second, I'll point it out. But they load, practically speaking, on a spectrum as needed. Right. If there's no loading that needs to be done, then they don't do it. Sometimes it's frequently, once or twice a week. Sometimes it's every other week. Sometimes it's every other month. I do want to, respectfully, my friend's argument underscores the problem that I'm having. Depending on the cases you choose to apply, the outcome is affected in this case. He says there's no cases about frequency. That's untrue. Amaya talks about frequency. The CP shoe case talks about frequency. In Olibas, get this, in Olibas, there was evidence, undisputed, that the drivers, who are undisputedly more connected to the safe transportation of cargo in interstate commerce, actually drove in interstate commerce. They did. It was in the record. But this court said, we're going to, nonetheless, affirm the judgment of the trial court that those drivers were not exempt, even though they, in fact, drove across state lines. I have trouble squaring that with the facts of this case. And I do hope that the panel answers the question and provides some clarity. Because it makes our job as lawyers difficult to advise clients in these situations. I think it's quite unlikely, at least speaking for myself, that we would set some sort of specific standard. There's been a lot of opportunity to do it before. What would you suggest, other than something that would allow your clients to win? I think we think we should gauge this. It would be consistent with the case law there that we would even have authority as a panel to say. I'm sorry. Can you repeat that? We can't override existing case law. So I'm saying, based on the precedents that are there, what could we say that would, in any way, assist your client insofar as frequency is concerned? Your Honor, my friend likes the Songer case. And he says, under the rule of orderliness, to the extent there's any inconsistency with subsequent decisions, they're not binding. But what about the cases before Songer, the Supreme Court cases from the 40s that we talked about, the CP Shoe case that we talked about? I think it would be helpful to remind parties that it matters whether or not a defendant is a common or private carrier. And the common carriers, it's more relaxed. It's easier to get to the exemption, and understandably so. But at bottom, I do want to remind the Court that this exemption is for transportation workers. That's why it exists. And the test, fundamentally, is whether or not the Secretary of Transportation has the power to regulate the hours of service and the qualifications for people in the transportation industry. He does it now for drivers. This is talked about in the Levinson case. And he says, I'm going to make sure they can read and write, and speak, and understand English. I'm going to make sure they're fit for duty. And I'm going to make sure that they don't get fatigued. So I'm going to regulate the number of hours they worked. I can imagine a situation where the Secretary of Transportation says, I am going to enact regulations, regulating, formally regulating, because he hasn't done so yet, Mr. Kelly and these welders. And I think a challenge to that power graph would be well-received by every court that heard it. They would say, Mr. Secretary, you do not have the power to regulate, under the Motor Carrier Act, these construction workers. That is the test. If you think the Secretary of Transportation could regulate Mr. Kelly in every single week that he worked, regardless of whether or not he loaded, then affirm. But if you think the Secretary's power to regulate is more limited than that, then I would urge the court to reverse. I do want to say that one thing about the records that we talked about, the employee work reports, there was testimony at trial that those were required. The employees were required to complete them and check a box, regardless of whether or not they actually did any work, as a condition of their job. And so what are you just saying here at the very end of your argument, that these forms that actually indicated maybe once a week the workers were loading, that they were forced to check that, even if they weren't? That's in the evidence? That's in the evidence, Your Honor. What did the district judge say about that, if anything? Well, he made a credibility determination and said, I still think they're accurate, but there is testimony in the record that they said we had to sign these to get our paycheck. And importantly, they don't document the other type of work or the relative amounts between the loading and the other duties they perform. Thank you for your time. All right, Mr. Hedda. Thanks to both of you and all the litigants who have been before us this week. This is the last case of this panel. We are adjourned under the regular order.